RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――――

REZA YAZDIAN,

*Plaintiff-Appellant,*

*v.*

No. 14-3745

CONMED ENDOSCOPIC TECHNOLOGIES, INC.,

*Defendant-Appellee.*

―――――――――――――

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:12-cv-00951—Sandra S. Beckwith, District Judge.

Argued: March 6, 2015

Decided and Filed: July 14, 2015

Before: COLE, Chief Judge, MOORE and CLAY, Circuit Judges.

―――――――――――――

**COUNSEL**

**ARGUED:** George M. Reul, Jr., FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellant. Laura L. Spring, COHEN, COMPAGNI, BECKMAN, APPLER & KNOLL, Syracuse, New York, for Appellee. **ON BRIEF:** George M. Reul, Jr., FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellant. Laura L. Spring, COHEN, COMPAGNI, BECKMAN, APPLER & KNOLL, Syracuse, New York, Colleen M. Blandford, KOHNEN & PATTON LLP, Cincinnati, Ohio, for Appellee.

1

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.

## I.  BACKGROUND

Plaintiff-Appellant Reza Yazdian is a first-generation Iranian American and non-practicing Muslim, who worked as a territory manager for Defendant-Appellee ConMed Endoscopic Technologies, Inc., for approximately five years.  During his tenure at ConMed, Yazdian received awards, promotions, and praise, but he also had interpersonal problems with his manager, Timothy Sweatt.  In June 2010, Yazdian complained that Sweatt was creating a hostile work environment and discriminating against him; within six weeks of this complaint, ConMed terminated Yazdian.

Yazdian filed this action, alleging that ConMed terminated him in retaliation for opposing an unlawful employment practice and because of his national origin and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  The district court granted summary judgment for ConMed on both claims.  We hold that the district court erroneously entered summary judgment on the retaliation claim, and therefore we **REVERSE** the judgment and **REMAND** the case to the district court for further proceedings.  Because no reasonable jury could find that ConMed terminated Yazdian because of his national origin or religion, we **AFFIRM** the judgment with respect to the discrimination claim.

## II.  FACTS AND PROCEDURAL HISTORY

Yazdian sold endoscopic products as a territory manager for ConMed in the territory around Cincinnati, Ohio, from April 1, 2005, to July 26, 2010, when ConMed terminated his employment.  By all accounts, Yazdian was a talented salesman, receiving awards, bonuses, and promotions for his performance at ConMed.  In 2009, Yazdian's supervisors rated his work "good" or "very good" in all categories.

From early 2008 to July 2010, Tim Sweatt was a district manager and Yazdian's direct supervisor. During the time leading up to Yazdian's termination, Sweatt reported to the director of sales, Scott Jackson. Yazdian and Sweatt had a rocky relationship, which Yazdian asserts was the result of Sweatt's prejudice against Iranians and Muslims, as evidenced by four events.

First, Yazdian felt that Sweatt singled him out because of his ethnic background when, in early 2009, Sweatt sent Yazdian an unsolicited article from National Geographic about ancient Persia. Attached to the article was a note from Sweatt: "Reza, I took out the subscription to National Geographic for my kids, but this cover story on ancient Iran caught my eye [and] was a very interesting read. Thught [sic] you would want to see it as well." R. 39-1 at 2 (Sweatt Dep. Ex. 2) (Page ID #1231). Sweatt explained that he sent Yazdian the article because he had a custom of sending his territory managers interesting articles to build rapport and thought Yazdian would find the article interesting because "[Yazdian] talked very frequently to anyone who would listen about his—he [sic] was very proud of his Persian heritage, Iranian heritage . . . ." R. 39 at 111–12 (Sweatt Dep.) (Page ID #1085–86).

The second incident occurred in December 2009, when Sweatt sent all territory managers gift certificates to the Honey Baked Ham Store because it was customary for the ConMed managers to send territory managers holiday gifts. Sweatt sent Yazdian a separate email about the gift in which he said, "Although I believe you have said you do eat pork, I would like to mention that if you have never shopped at this place, they have many other items—the turkey is quite good!" R. 39-1 at 15 (Sweatt Dep. Ex. 16) (Page ID #1244). Yazdian took offense; he believed that Sweatt had singled him out by referencing that he was a Muslim.

Third, in February 2010, Sweatt invited Yazdian and John Kruse—a non-Iranian, non-Muslim territory manager—to attend a national sales meeting. Both Kruse and Yazdian expected to receive an award at the meeting. At the beginning of the multi-day meeting, Sweatt told Kruse that he would not receive the award and requested that Kruse not tell Yazdian because Sweatt thought it would be best to deliver the news in person. Shortly before the ceremony, Sweatt told Yazdian the disappointing news that Yazdian would not receive an award. Yazdian was offended that Sweatt had not given him advance notice as he had done with Kruse.

Finally, Yazdian believed that he was passed over for a promotion in favor of less qualified non-Iranian, non-Muslim employees. In the winter of 2009–10, Sweatt and Jackson solicited applications for field trainers. Sweatt sought applications from John Kruse and Pat O'Brien, who are both white and less senior than Yazdian, but he never approached Yazdian about the opportunity despite knowing that Yazdian desired a promotion.

The conflict between Yazdian and Sweatt came to a head in April 2010 after Yazdian closed a very large sale and submitted an article that he had written about the deal to *Marketing Messenger*, ConMed's internal newsletter. Christine Pandolf, the editor, did not want to publish the article immediately because it was longer than typical articles, and she wanted to validate the information in the article with Sweatt. After Sweatt reviewed the article, he told Yazdian that he would not publish the article as written. When Yazdian asked for an explanation, Sweatt explained that it was not a territory manager's job to submit articles and that Yazdian's article was "embarrassing," "poorly worded," and "far too self-serving." R. 39 at 200–01 (Sweatt Dep.) (Page ID #1174–75). Yazdian became upset and confronted Sweatt, asserting "[Y]ou don't like the way I write. You don't like the way I talk. I guess you don't like my race, either." *Id.* at 201 (Page ID #1175).

On June 1, 2010, Yazdian and Sweatt had a telephone meeting during which Yazdian lodged numerous complaints. According to Sweatt's notes, Yazdian said that Sweatt was creating a hostile work environment; that Sweatt was the worst manager Yazdian had ever had; that Yazdian fielded many emails from co-workers about Sweatt's management style; that Sweatt had not backed Yazdian on anything; and that Sweatt did not show Yazdian any "longevity or respect." R. 43-1 at 7 (Sweatt Notes) (Page ID #1775). Yazdian also apparently told Sweatt, "I'm in the driver seat, don't think you are[.] You are out of line." *Id.*

Soon after the phone call, Yazdian called Jackson to request a transfer to another division that was under the supervision of a different manager. Yazdian explained that he wanted to transfer because Sweatt was creating a hostile work environment for him, treating him differently from other territory managers, and possibly discriminating against him. Yazdian testified that Jackson's response was to tell Yazdian to "look into a mirror" and to "complain to HR about it"

"if [Yazdian,] ha[d] a smoking gun."  R. 41 at 56 (Yazdian Dep. II at 278)[1] (Page ID #1314). Jackson's recollection is different; he testified that Yazdian wanted to transfer to a different division because he did not like Sweatt's management style.

On June 15, 2010, Sweatt, Jackson, and Karen Hutto, the vice president of human resources, discussed the friction between Sweatt and Yazdian.  After the meeting, Sweatt wrote an email to Hutto, which included examples of Yazdian's "behavioral issues."  *See* R. 47 at 1 (Email 6/18/10) (Page ID #1930).  The first example was Yazdian's response to Sweatt's decision not to publish the article in the *Marketing Messenger*, including Yazdian's accusation that Sweatt did not like Yazdian's race.  Sweatt also mentioned the June 1 phone conversation during which Yazdian complained that Sweatt was creating a hostile work environment.  Sweatt included three other examples of Yazdian's behavior:  (1) rudeness to Jackson, (2) a complaint by another territory manager that Yazdian was a negative influence, and (3) a claim that Yazdian did not want to accept responsibility for securing fewer orders from an existing client than he had in previous quarters.  *Id.* at 2 (Page ID #1931).  Sweatt summarized Yazdian's behavior as follows:

> The common theme in all of these examples is a [territory manager] who is unable to hear the word 'no' in any shape or form, and is unable and unwilling to accept constructive coaching and feedback from management.  He is unwilling to accept any coaching as to his behavior or communications, despite our repeated attempts to do so.

*Id.* at 3 (Page ID #1932).

In response to the email, Hutto directed Deborah Hebbard, a human resources manager, to draft a written warning to Yazdian based on the June 18 email from Sweatt.  On July 13, 2010, Sweatt issued the written warning and informed Yazdian on the phone that the reason for the warning was "ongoing unacceptable conduct/behavior, particularly in . . . communications." R. 46-9 at 1 (Sweatt Dep. Ex. 23) (Page ID #1911).  Attached to the letter were examples of the problematic behavior:  inappropriate outbursts, combativeness, rudeness or indifference to management, using a threatening tone, creating discord within the sales team, and unwillingness to accept and apply constructive coaching.  Among the supporting examples were references to

---

[1]ConMed deposed Yazdian twice, and so we have labeled the deposition transcripts by volume number.

Yazdian's June 1, 2010 comment that Sweatt was creating a hostile work environment, and the April 9, 2010 conversation during which Yazdian had said, "I guess you don't like my race either." *Id.* at 4 (Page ID #1914).

Before delivering the warning, Sweatt called Yazdian to discuss the letter. Yazdian told Sweatt that he would respond to the warning "through his counsel, in writing," and mentioned that he intended to call physicians to request that they write testimonial statements on his behalf and ConMed employees "to support his case that [Sweatt is] a bad manager." R. 44-8 at 1–3 (Jackson Dep. Ex. 13) (Page ID #1825–27). Sweatt wrote an email to Hebbard and Jackson describing the phone call and listed comments Yazdian allegedly made, including:

- I am going to put *you* on a warning.
- I'm going to win, 'cause I always do. . . .
- I'm going to bring you up on charges before the Board.
- Anything you have to say to me say it in writing.
- I can't believe you are doing this three weeks before my wedding . . . .
- I am going to bring a lawsuit against you, Tim, so you had better watch yourself.
- You have been out of line with me from day one.
- You are creating a hostile work environment for me.
- You are a bad individual.
- I can't believe that at my level you question my authority.
- You can't intimidate me by calling me about this letter.
- I am going to call Joe [Corasanti][2] directly on this.
- You are challenging my character.
- You have initiated a war with me. I've been waiting for you to do this. I'm looking forward to the dance with you. I will take this before the Board.
- You can't intimidate me because I've taken on federal judges before.
- You make poor decisions.
- You can't control my first amendment right.
- I want a paper trail with you.
- You make inappropriate business decisions.
- You are not in a position to challenge me.
- I don't think you are a gentlem[a]n.
- I know people respect me more than they respect you.
- I will be responding with charges on you.
- Don't call me anymore, except for our weekly call in.

---

[2]Corasanti was the CEO of ConMed.

*Id.* at 1–2 (Page ID #1825–26).**3** At the close of the email, Sweatt concluded that he was "not optimistic that there is anything close to a recognition [by Yazdian] of needed behavioral changes much less a commitment for improvement." *Id.* at 2 (Page ID #1826). In response, Jackson asked Sweatt what "next steps" they should take. *Id.* at 1 (Page ID #1825). Sweatt thought there were no more steps to take; he had made the decision to fire Yazdian immediately after this phone call. R. 39 at 194–96 (Sweatt Dep.) (Page ID #1168–70).

After talking with Sweatt, Yazdian called Jackson to discuss the warning letter and left a message, saying that he was going to take a week to "build a written case/rebuttal" and asked to speak with Jackson directly. R. 46-10 at 1 (Sweatt Dep. Ex. 24) (Page ID #1915). Yazdian also wrote Jackson an email, copying Sweatt and Hebbard, in which he reiterated that he wished to respond to the warning and that he intended to file a complaint against Sweatt with Human Resources.

On July 15, 2010, Hutto, Hebbard, Jackson, and Sweatt held a conference call to discuss Yazdian's future at ConMed. Sweatt told the group that Yazdian had launched into a "tirade" before Sweatt could discuss the warning letter. R. 47-7 at 1–2 (Hebbard Notes) (Page ID #1978–79). Jackson said that he had "experienced [Yazdian's] behavior first hand," and relayed three examples. *Id.* at 1 (Page ID #1978). Hutto decided that she needed to hear Yazdian's "side of the story in order to evaluate both sides," and so she asked Hebbard to investigate. *Id.*; R. 32 at 89–90 (Hebbard Dep.) (Page ID #363–64). During the phone call to Yazdian, Hebbard told him to draft a rebuttal to the warning letter, and later that day she sent Yazdian an email instructing him to submit the rebuttal to her by July 19. Yazdian testified that Hebbard warned him not to complain about Sweatt or Jackson in his rebuttal because that would be cause for immediate termination.

On July 18, 2010, Yazdian faxed a written response to the written warning to Hebbard in which he responded to each charge of inappropriate behavior and included letters of reference,

---

**3**Yazdian has admitted that he made the following comments: "I am going to put *you* on a warning"; "Anything you have to say to me say it in writing"; "I can't believe you are doing this three weeks before my wedding"; "You have been out of line with me from day one"; "You are creating a hostile work environment for me"; "I am going to call [ConMed CEO Joe Corasanti] directly on this"; and "You make poor decisions." *See* R. 41 at 66–71 (Yazdian Dep.) (Page ID #1324–29). He could not recall making the other statements. *See id.*

emails, and performance evaluations.  Neither Hebbard nor Jackson could remember reviewing the rebuttal.

On July 20, 2010, Hutto contacted Hebbard and told her, "[a]fter consultation with legal, I think we need to go more directly at the information provided by Tim indicating though [sic] Tim 'didn't like [Yazdian's] culture.'"  R. 47-9 at 1 (Hutto Email 7/20/10) (Page ID #1986). Hutto told Hebbard to find out if Yazdian "feel[s] this way," and if so, then why.  *Id.*  As directed, on July 22, Hebbard called Yazdian, but Yazdian raised his voice and made it clear that he thought the phone call was "ridiculous."  R. 32 at 101–02 (Hebbard Dep.) (Page ID #375–76). According to Hebbard, Yazdian told her that his comments to Sweatt were "taken out of context."  *Id.* at 101 (Page ID #375); R. 47-12 (Hebbard Notes 7/22/10) (Page ID #1994). Yazdian describes the phone call differently.  He testified that Hebbard never mentioned that she was investigating claims of discrimination and, in fact, indicated that he was not allowed to complain about Sweatt or Jackson, which he understood to mean that he could not discuss Sweatt's discriminatory conduct.  After the telephone conversation, Hebbard closed the investigation and filed a report in which she wrote that Yazdian had not mentioned prejudice or harassment during their conversation.  That was the end of ConMed's investigation into Yazdian's discrimination complaints.

On July 26, 2010, Sweatt, Jackson, Hutto, and Hebbard decided to terminate Yazdian's employment.  ConMed maintains that it had to terminate Yazdian's employment for violating ConMed's conduct policy, "prior behavioral issues, and because when he received his written warning, he became combative."  Appellee Br. at 27.  Yazdian avers that these reasons are pretext because ConMed terminated him in retaliation for his complaints about discrimination and because of his ethnic origin and religion.

On February 28, 2011, Yazdian filed discrimination and retaliation charges against ConMed with the EEOC.  After the EEOC issued a probable cause determination in Yazdian's favor, Yazdian filed the instant lawsuit, alleging that ConMed violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by discriminating and retaliating against him. Yazdian amended his complaint to include a claim of unjust enrichment under Ohio law.  After

discovery, ConMed filed a motion for summary judgment, which the district court granted with respect to all claims.

Yazdian now appeals the district court's judgment as to the Title VII discrimination and retaliation claims. He does not appeal the district court's order with respect to his unjust-enrichment claim.

## III.  TITLE VII

We review a district court's grant of summary judgment de novo. *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). When considering whether there is a genuine dispute of material fact, we must believe Yazdian's evidence and draw "all justifiable inferences . . . in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We must abstain from making credibility determinations, weighing evidence, and "drawing of legitimate inferences" in favor of the moving party because those are "jury functions, not those of a judge." *Id.*

### A.  Retaliation Claim

Title VII makes it an "unlawful employment practice" for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers from "discriminat[ing] against . . . [an] employee . . . because [the employee] has opposed any [unlawful] employment practice, or because [the employee] has made a charge" that the employer has engaged in an unlawful employment practice. *Id*. § 2000e-3(a). Yazdian alleges that ConMed violated Title VII by terminating him for complaining about Sweatt's discriminatory conduct.

A plaintiff who alleges retaliation in violation of Title VII may establish the claim through direct or circumstantial evidence. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Yazdian contends that he has introduced both direct and circumstantial evidence of retaliation for engaging in protected activity. ConMed argues that Yazdian has failed to show that he can meet his burden using either method of proof because he did not engage in protected activity. We begin with whether Yazdian opposed an employment practice

that he reasonably believed was discriminatory because that question is essential to the viability of Yazdian's retaliation claim.

### 1. Protected Activity

To come within the protection of Title VII, Yazdian must establish that he challenged an employment practice that he reasonably believed was unlawful. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000). Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice. *See id.* ("Of critical import here is the fact that there is no qualification . . . on the party to whom the complaint is made known . . . ."). Indeed, "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015). Title VII does not protect an employee, however, if his opposition is merely a "vague charge of discrimination." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989); *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007). Although vague complaints do not constitute opposition, "*Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013).

ConMed argues that, under *Fox* and *Booker*, Yazdian's complaints were too vague to qualify as opposition to an unlawful employment practice. We disagree. In *Fox*, we concluded that the plaintiff had not engaged in protected activity within the meaning of the Age Discrimination in Employment Act ("ADEA")[4] because the plaintiff's statements to his manager were too vague to "amount to opposition to an unlawful employment practice." 510 F.3d at 591. *Fox*'s complaints were ambiguous. Fox told his manager that he intended to sue the defendant company, that "upper management [was] out to get him," and that the management had "prevented him from becoming a pre sell rep." *Id.* at 589–90, 592. He did not once mention that he believed that management had discriminated against him on the basis of age. *Id.* at 592. We concluded that these inexact allegations were not sufficient to alert the employer that the plaintiff was opposing an unlawful employment practice. *Id.*

---

[4]We analyze the anti-retaliation provisions of the ADEA and Title VII similarly. *Fox*, 510 F.3d at 591.

In *Booker*, the black plaintiff cited two instances of opposition to unlawful employment practices. First, he complained that his immediate supervisor had said, when referring to blacks, "I don't know if these people can comprehend asset management." *Booker*, 879 F.2d at 1309. Second, he wrote a letter to the Human Resources Department in which he alleged that the company's critique of the plaintiff's management style was "a case of ethnocism." *Id*. We concluded that neither instance constituted opposition to an unlawful employment practice under Title VII. *Id*. at 1313. We held that the first complaint was limited to an isolated comment by one employee, and therefore the plaintiff had not opposed the company's employment practices. *Id*. And we struggled to understand what exactly the plaintiff meant by alleging that the company engaged in "ethnocism." *Id*. at 1313 & n.4. For that reason, we held that this vague charge was insufficient to notify the employer that the plaintiff was opposing an unlawful practice. *Id*. at 1313.

Here, however, Yazdian's complaints were more specifically defined. Yazdian complained about allegedly unlawful discrimination multiple times during his employment at ConMed. He made the following six statements to Sweatt, which individually and together qualify as Title-VII protected activity:

- "I'm going to respond with counsel."
- "I'm going to bring you up on charges before . . ."
- "Bring a lawsuit against [Sweatt]"
- "Hostile work environment."
- "I will have an attorney respond."
- "I will be responding with charges."

Appellant Br. at 25. These statements—particularly the hostile-work-environment charge—put ConMed on notice that Yazdian believed that Sweatt's conduct was illegal. "Hostile work environment" is a term of art, which refers to an unlawful employment practice under Title VII that arises because of "discriminatory intimidation, ridicule, and insult[s]" repeatedly directed at an employee on the basis of a protected characteristic. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002) (internal quotation marks omitted). Thus, an employee who complains that an employer is creating a "hostile work environment" engages in Title-VII-protected activity when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or treatment. A reasonable jury

could conclude that Yazdian used and intended the phrase "hostile work environment" to reference discriminatory treatment because he was aware of the legal significance of the term and meant it to be a complaint about national-origin or religious discrimination.

Just as an employee is entitled to protection for opposition to employment practices that may not actually be unlawful under Title VII, *Johnson*, 215 F.3d at 579–80, an employee who opposes a hostile work environment need not prove that the environment he complained of was actually hostile in order for the employee to receive protection from retaliation under Title VII. Rather, the employee's complaints about a hostile work environment must "be based on 'a reasonable and good faith belief that the opposed practices were unlawful.'" *Id.* at 579 (quoting *EEOC Compliance Manual* ¶ 8006). This requirement includes objective and subjective components: the employee complaining of a hostile work environment must "actually believe[] that the conduct complained of constituted a violation of relevant law," and "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee" would believe that the conduct complained of was unlawful. *Rhinehimer v. U.S. Bancorp Invs., Inc.*, --- F.3d ---, No. 13-6641, 2015 WL 3404658, at *11 (6th Cir. May 28, 2015) (internal quotation marks omitted) (interpreting the reasonable-belief requirement of the Sarbanes-Oxley Act's anti-retaliation provision). This two-part inquiry is "necessarily fact-dependent, varying with the circumstances of the case." *Id.* Therefore, "the issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts known to the employee amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring." *Id.* (internal quotation marks and alterations omitted). "[A]n employee need not establish the reasonableness of his or her belief as to each element of the violation. Instead, the reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience." *Id.* Because this inquiry is fact-intensive, has not been briefed, and was not addressed in the district court, we leave the question whether Yazdian reasonably believed that the work environment was a hostile work environment for consideration by the district court in the first instance.

In addition, the record shows that ConMed understood Yazdian's complaints as opposition to Sweatt's conduct because the legal department told Hutto to investigate Yazdian's claim after learning that Yazdian had accused Sweatt of creating a hostile work environment and not liking his "race." Employers should, of course, investigate complaints like Yazdian's. But Hutto's response to Yazdian's assertions is evidence that a reasonable employer would understand Yazdian's comments as opposition to perceived unlawful employment practices. There is a strong inference that ConMed read the two complaints together, as well as Yazdian's references to "responding with counsel" or "filing a complaint" against Sweatt as a claim of discrimination on the basis of national origin.

Moreover, in late 2008 and June 2010, Yazdian had complained about discrimination on the basis of national origin and religion to Sweatt and Jackson, as well. In addition to these statements, Yazdian complained to co-workers about Sweatt's actions. After receiving the Honey Baked Ham Store gift certificate from Sweatt, Yazdian told his co-workers Reggie Bryant, John Kruse, and Kara Ticker that he thought the email was discriminatory. Moreover, Yazdian asserts that he had complained to Sweatt about a hostile work environment in June 2009, during the conversation about the Persia article, and also in late 2008.

ConMed contends that Yazdian did not engage in Title VII-protected activity because he "never made a complaint to Human Resources, or to ConMed's General Counsel or Legal Department." Appellee Br. at 50. But protected activity includes complaints to co-workers, reporters, and managers, and therefore to whom Yazdian made statements opposing discrimination is immaterial to the viability of his retaliation claim. *See New Breed*, 783 F.3d at 1067; *Johnson*, 215 F.3d at 580.

There is one problem for Yazdian. In *Trujillo v. Henniges Automotive Sealing Systems North America, Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012), we said that an employee's complaints "about management practices, rather than . . . [about] racial discrimination" are too vague to "constitute opposition to employment discrimination." Many of Yazdian's complaints may reflect concerns about Sweatt's management style, rather than charges of discrimination. Indeed, the majority of Yazdian's complaints may pertain to Sweatt's management style. But we do not need to decide whether Yazdian's complaints solely addressed Sweatt's management style

because, when there are two reasonable ways to read the record, then summary judgment is not proper. Yazdian has offered a reasonable alternative explanation regarding his comments, namely that he also complained about Sweatt's discriminatory conduct. Thus, a reasonable jury could conclude that Yazdian had engaged in Title-VII protected activity.[5]

## 2. Direct Evidence of Retaliation

Yazdian argues that he has presented direct evidence that ConMed terminated him because he opposed Sweatt's alleged discriminatory treatment. "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle*, 515 F.3d at 543–44. If there is direct evidence of retaliation, then "the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346–47 (6th Cir. 2012) (internal quotation marks and citation omitted).

Yazdian cites as direct evidence of retaliation that Sweatt specifically referenced Yazdian's protected statements as examples of insubordination. When Sweatt provided ConMed with examples of Yazdian's communication problems and "unwillingness to accept and apply constructive coaching," Sweatt cited Yazdian's hostile-work-environment and discrimination comments as examples. R. 46-9 at 3–4 (Sweatt Dep. Ex. 23) (Page ID #1913–14). Sweatt described Yazdian's claim that Sweatt was "creating a hostile working environment for [him]," as "unprofessional" and "totally unacceptable." *Id.* at 3 (Page ID #1913). Sweatt cited the incident when Yazdian said to Sweatt, "I guess you don't like my race either" as an example of Yazdian's alleged "unwillingness to accept and apply constructive coaching." *Id.* at 4 (Page ID #1914). And, crucially, Sweatt testified that he made the decision to fire Yazdian immediately after this phone call in which Yazdian said the following: (1) that Yazdian was going to file a lawsuit, (2) that Sweatt was creating a hostile work environment, and (3) that Yazdian would respond to the warning letter with charges. After Yazdian made these comments, Sweatt told Jackson and Hebbard that he was not optimistic about Yazdian's ability to change "[b]ased on

---

[5]Although Yazdian and his counsel call this "race" discrimination, counsel clarified at oral argument that Yazdian's race is "Caucasian," and he makes no claim that other races were treated differently. Yazdian's claim seems to be rather a claim of national-origin discrimination based upon his Iranian heritage.

*these statements*." R. 44-8 at 2 (Jackson Dep. Ex. 13) (Page ID #1826); R. 39 at 195–96 (Sweatt Dep.) (Page ID #1169–70) (emphasis added). Thus, these documents are direct evidence from which a reasonable jury could conclude that Sweatt believed Yazdian's protected activity constituted insubordination, and therefore that Sweatt terminated Yazdian because of the protected statements that Yazdian had made.

Moreover, summary judgment is not proper when an employer cites an employee's tone of voice or manner of speaking as the cause of termination—particularly in the context of a Title VII claim of retaliation. *See, e.g.*, *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) ("As we have noted, low evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees."); *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136–37 (9th Cir. 2003) ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext.'" (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990))); *Ware v. Unified Sch. Dist. No. 492, Butler Cnty.*, 881 F.2d 906, 912 (10th Cir. 1989), *opinion modified on denial of reh'g,* 902 F.2d 815 (10th Cir. 1990) ("The evidence presented by both sides consisted largely of subjective evaluations of body language, tone of voice, facial expressions, the nature of the office atmosphere, and other inferences drawn from non-verbal conduct. In addition, the testimony as to the content of the critical conversations between Ware and Geil was directly conflicting. The weight given such subjective and contradictory evidence necessarily depends on an evaluation of the credibility of the witnesses, a function exclusively within the province of the jury." (footnote omitted)). Perception of a person's manner of speaking is inherently subjective, and therefore we must leave it to the jury to decide whether they believe Yazdian's or Sweatt's account of the conversation.

Admittedly, there is evidence in the record that lends support for Sweatt's assertion that Yazdian's behavior was cause for termination. In the warning letter to Yazdian, Sweatt referenced Yazdian's "combativeness," "rudeness," "outbursts," a "loud" and "abusive" tone, and "discord," which suggests that Sweatt's concerns actually related to Yazdian's communication style, rather than substance. *See* R. 46-9 at 2–4 (Sweatt Dep. Ex. 23) (Page ID

#1912–14).   But this is another example of where the appropriate standard of review for summary judgment comes into play:  we must leave it to a jury to decide whether Sweatt actually decided to terminate Yazdian because of Yazdian's tone or because of his statements.  Where, as here, there are two reasonable interpretations of the evidence, we must allow the jury to resolve the issue of whether the evidence Yazdian cites is sufficient evidence to conclude that ConMed retaliated against Yazdian for opposing an unlawful employment practice.  *See Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) ("Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment . . . .").

### 3.  Circumstantial Evidence of Retaliation

Yazdian also contends that the grant of summary judgment was improper because he had presented circumstantial evidence from which a reasonable jury could find that ConMed terminated Yazdian in retaliation for protected activity.  Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973), Yazdian must first produce evidence of a prima facie case of retaliation by showing that "(1) he engaged in protected activity"; (2) ConMed was aware that Yazdian had engaged in protected activity; (3) after Yazdian engaged in protected activity, ConMed took an "adverse employment action" against Yazdian; and (4) "there was a causal connection between the protected activity and the adverse employment action."  *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (internal quotation marks and alterations omitted).  The Supreme Court has held that the fourth part of the test "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc).  Nevertheless, at the summary-judgment stage, the "burden to establish a prima facie case of retaliation . . . is a burden easily met."  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

If Yazdian has produced enough evidence to make out a prima facie case of retaliation, then the burden shifts to ConMed "to produce evidence of a legitimate, nondiscriminatory reason for its actions."  *Hamilton*, 556 F.3d at 435 (internal quotation marks omitted).  If ConMed meets

that burden of production, then Yazdian must produce evidence "demonstrating that this legitimate reason is pretextual." *Id.*

### a. Prima Facie Evidence of Retaliation

ConMed argues that Yazdian has not met his burden at the prima facie stage because he did not engage in protected activity and, even if he did, he would have been fired regardless of his complaints about discrimination. Apparently ConMed concedes that it knew of Yazdian's discrimination charge and that termination is an adverse employment action, as it must. Because we hold that a reasonable jury could find that Yazdian engaged in protected activity, *see* Section III.A.1, the only remaining issue is whether there is a causal connection between Yazdian's protected activity and his termination.

Yazdian relies primarily on the temporal proximity of his complaints and termination. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses" between the employee's protected activity and the adverse employment action, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*; *see also Hamilton*, 556 F.3d at 435.

ConMed became aware that Yazdian had engaged in protected activity on June 1, 2010, when, in a comment to Jackson, Yazdian accused Sweatt of creating a hostile work environment. Eight weeks later, on July 26, 2010, ConMed terminated Yazdian's employment. Yazdian has coupled the temporal proximity of his protected activity and termination with Sweatt's email and the warning letter, in which Sweatt referred to Yazdian's comments about a hostile work environment and discrimination as insubordination—the same evidence Yazdian cites as direct evidence of retaliation. The temporal proximity of Yazdian's protected activity and his termination and these documents in which Sweatt called Yazdian's protected activity inappropriate are evidence that Yazdian's complaints about discrimination were the but-for cause of his termination. Accordingly, Yazdian has produced enough evidence to establish a prima facie retaliation claim.

ConMed raises one additional issue to consider:  the effect of *Nassar* on our temporal-proximity analysis.  ConMed argues that applying the temporal-proximity analysis in this case conflicts with the Supreme Court's concern about frivolous employment litigation.  In *Nassar*, the Court provided the following hypothetical in support of its conclusion that Title VII requires but-for causation analysis:

> Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location.  To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation.  If respondent were to prevail in his argument here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances.

133 S. Ct. at 2532.  ConMed implies that Yazdian complained of national-origin and religious discrimination to prevent his impending termination.

The trouble with ConMed's assertion is that Yazdian has produced enough evidence from which a reasonable jury could conclude that he made multiple complaints about a hostile work environment well before he knew that his job was in jeopardy.  If ConMed wants to argue that Yazdian wrongfully complained about discrimination in order to save his job, then it may make that argument to the jury, but we cannot, at the summary-judgment stage, assume "that employees who are about to be fired" will "abuse the civil-rights protections by filing frivolous harassment complaints."[6]  *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014).

### b. Pretext

Once the plaintiff has made a prima facie case of retaliation, the employer must proffer a legitimate, nondiscriminatory reason for its employment decision.  *Hamilton*, 556 F.3d at 435.  ConMed has asserted legitimate, nondiscriminatory motives for terminating Yazdian's employment—insubordination and "unprofessional behavior."  Appellee Br. at 37–43, 55.  Yazdian does not argue that ConMed's proffered reason is illegitimate.  Yazdian must therefore

---

[6]In *Nassar*, the Supreme Court addressed whether the evidence of but-for causation presented *at trial* was sufficient to support the jury's verdict in favor of the plaintiff.  *See Nassar*, 133 S. Ct. at 2524.

establish that these stated reasons are pretext by producing "enough evidence to . . . rebut, but not to disprove [ConMed's] proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014) (internal quotation marks omitted). He may do this "by showing (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his [termination], or (3) that they were *insufficient* to motivate discharge." *Chattman*, 686 F.3d at 349 (internal quotation marks omitted).

Yazdian challenges ConMed's rationale on the first and second grounds. To show that there is no basis in fact for discharge for insubordination and behavior, Yazdian must produce evidence to show that he was not insubordinate or rude. *See id.* "[T]he second category requires that [Yazdian] admit the factual basis underlying the employer's proffered explanation and further admit that such conduct could motivate dismissal," but that a reasonable jury could believe that the insubordination and behavioral issues did not actually motivate ConMed's decision to terminate him. *Id.* (internal quotation marks omitted).

First, Yazdian argues that a jury should be able to decide whether he was actually insubordinate. The district court held that no reasonable jury could find that ConMed's stated legitimate reasons were pretextual because Yazdian had made "objectively rude, disrespectful and insubordinate comments." R. 57 at 23 (D. Ct. Op. & Order) (Page ID #2599). The district court erred by making this subjective determination. Sweatt cited Yazdian's complaints about a hostile work environment and discrimination as "out of line," evidence of Yazdian's alleged "[u]nwillingness to accept and apply constructive coaching," and evidence that Yazdian would not change his behavior. R. 44-8 at 2 (Jackson Dep. Ex. 13) (Page ID #1826); R. 46-9 at 3–4 (Sweatt Dep. Ex. 23) (Page ID #1913–14). At the summary-judgment stage, we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged "insubordination consists of refusing to cease what a jury could find to be reasonable [Title VII]-protected activity." *Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998).

Moreover, not all "insubordination" is treated equally. We have long held that an employer has legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions. *See, e.g.*, *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013); *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).

There is a difference, however, between a refusal to follow an order and an assertion that an employee was "rude" or "defiant." Indeed, there may be some instances when the allegedly insubordinate act may be a response to a sort of unspoken, subliminal discrimination in the workplace. For example, a woman who takes a strong position may be considered "pushy," whereas a man who does the same is "assertive." One manager may call a black man "aggressive" and a white man "passionate" for the same speech. These are just a few examples of how subjective these adjectival labels can be. And whether these adjectives are evidence of discrimination or are legitimate grounds for termination requires examining the words in context and the demeanor of the speakers—quintessential jury functions.

The trouble for Yazdian, however, is that Sweatt cited comments other than complaints of discrimination as evidence of insubordination. For example, Yazdian allegedly called Sweatt a "bad individual" and not "a gentlem[a]n," and also said that Sweatt "make[s] inappropriate business decisions." R. 44-8 at 2 (Jackson Dep. Ex. 13) (Page ID #1826). It is a stretch to argue that these comments are appropriate in the workplace in isolation or are illegitimate grounds for termination. On the other hand, Yazdian made these comments during the same conversation that he told Sweatt that he was going to file a complaint, which is to say that Yazdian's complaints about Sweatt's management style were intertwined with Yazdian's concerns about a hostile work environment. Moreover, Yazdian has offered some evidence to undermine Sweatt's and Jackson's description of Yazdian's behavior. Reggie Bryant, a former ConMed territory manager, submitted an affidavit in which he contests Sweatt's description of Yazdian's behavior as rude. Because a reasonable jury could find that Yazdian was not insubordinate, we hold that summary judgment is not proper.

Yazdian also argues that a jury could find that ConMed's proffered reason for the adverse employment action was pretextual because Yazdian's alleged insubordination did not actually motivate his termination. He cites two reasons as support. First, Sweatt repeatedly cited Yazdian's protected comments as evidence of unacceptable behavior. Second, Sweatt's and Jackson's complaints about Yazdian's tone and behavior surfaced only after Yazdian started complaining that Sweatt was creating a hostile work environment.

We have thoroughly addressed the first point, so we turn to the second. ConMed cites evidence that it critiqued Yazdian for his communication style before he engaged in protected activity. According to Sweatt, Yazdian's previous supervisors, Rick Zaberer and Dennis Werger, described Yazdian as "very capable," but "a challenge to manage." R. 39 at 42 (Sweatt Dep.) (Page ID #1016). Jackson also remembered that Werger mentioned that Yazdian had "some behavioral challenges," but he could not recall the specific concerns. R. 42 at 64–65 (Jackson Dep.) (Page ID #1602–03). Both Sweatt and Jackson described Yazdian as difficult to manage. The main "behavioral issues" that Sweatt and Jackson cited were self-centeredness, negativity, rudeness, and defensiveness. And the record shows that Sweatt discussed these behavioral issues with Yazdian as early as April 2009 and up until Yazdian's termination. *See, e.g.*, R. 37-1 at 1 (Yazdian Dep. Ex. 7) (Page ID #953) ("I expect you to be positive with [Kara] about Marketing and Management."); R. 39-1 at 9 (Sweatt Dep. Ex. 10) (Page ID #1238) ("Too often your messages are negative, self-centered, and redundant. Without immediate correction, this behavior will affect the Southeast District for which I am responsible."). Jackson also testified that Yazdian had been rude to him during a sales meeting in October 2009.

Even though Sweatt and Jackson had cautioned Yazdian about his communication style, they were not clear with Yazdian that these behavioral issues might lead to his termination. In Yazdian's 2009 performance appraisal, Sweatt rated Yazdian's performance as "good" or "very good" in all categories, including "attitude and cooperation," "communications," and "interpersonal relationships." *See* R. 46-4 at 2–6 (2009 Performance Appraisal) (Page ID #1890–93). Sweatt noted that Yazdian's communications could be "overly negative" when frustrated, but did not provide any suggestion that this was a major concern. *Id.* at 4 (Page ID #1892).

Finally, the evidence of Yazdian's communication problems cuts against ConMed's claim that Yazdian would have been fired regardless of his complaints. A jury could reasonably conclude that Yazdian's behavior was not so bad as to warrant termination because Yazdian consistently performed well, and his behavior became a problem only after Yazdian complained that Sweatt was creating a hostile work environment. A jury could also decide that Sweatt was monitoring Yazdian's behavior and that Yazdian's failure to improve was the actual reason for

the adverse employment action. Because there are two reasonable interpretations, and because we must accept the version most favorable to Yazdian, which is sufficient evidence of pretext, summary judgment is not appropriate here.

### c. The Honest Belief Doctrine

ConMed asserts that it had an "honest belief" in its nondiscriminatory reason for firing Yazdian, namely that Yazdian had "breached ConMed's conduct policy." Appellee Br. at 41–43. ConMed may "avoid a finding that its claimed nondiscriminatory reason was pretextual" if it establishes that it "reasonabl[y] reli[ed] on the particularized facts that were before it at the time the decision was made," even if evidence later shows that the reason was baseless. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (citation and internal quotation marks omitted). ConMed must show that it "made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citation and internal quotation marks omitted).

ConMed does not enjoy this protection, however, if Yazdian produces evidence sufficient to allow a jury to conclude reasonably "that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action . . . ." *Id.* (citation omitted). Yazdian argues that we should not pay credence to ConMed's asserted "honest belief" because ConMed did not conduct an investigation into Sweatt's stated reason for the decision to terminate Yazdian or Yazdian's discrimination claim. We agree.

The record suggests that ConMed chose to terminate Yazdian based solely on Sweatt's account of events. Hebbard did not interview Yazdian, his co-workers, or past managers to determine the basis of Sweatt's allegations before drafting the warning letter. In addition, on July 13, 2010, after Yazdian spoke with Sweatt about the warning letter, Yazdian contacted Jackson, Sweatt, and Hebbard to let them know that he wanted an opportunity to present his side of the story with respect to the contents of the letter. Yazdian also said that he wanted to file a complaint against Sweatt with Human Resources. On July 26, 2010, ConMed made the decision to terminate Yazdian before even reading Yazdian's rebuttal letter, which he had submitted on July 18. ConMed could not have been fully informed about the circumstances surrounding Yazdian's termination if it did not even take the time to read Yazdian's response.

Moreover, if we take the facts in the light most favorable to Yazdian, as we must, then there is evidence in the record that ConMed did not afford Yazdian the opportunity to file a discrimination complaint even though it was aware that he planned to file one. Yazdian testified that Hebbard told him that he could not complain about Sweatt when she called him to discuss his allegations of discrimination, and therefore he did not address his discrimination claims during the phone call. This is particularly problematic because the record indicates that Sweatt was the person most instrumental in the decision to terminate Yazdian. Indeed, ConMed appears to have made the decision to terminate Yazdian entirely based on Sweatt's description of the phone call with Yazdian. "One conversation [does] not establish sufficient particularized facts about the truth behind [Sweatt's] statements, let alone [his] motive." *Shazor*, 744 F.3d at 961. Thus, a reasonable jury could find that ConMed's belief in the reason for Yazdian's termination was not honestly held because ConMed did not investigate Yazdian's discrimination complaint and blindly followed Sweatt's recommendation to terminate Yazdian.

## B. Discrimination Claim

Yazdian also alleges that ConMed violated Title VII because of his Iranian heritage and Muslim religion.[7] Yazdian does not claim that there is direct evidence of discrimination, and therefore relies on the *McDonnell Douglas* burden-shifting analysis to develop his discrimination claim. Under that framework, like the retaliation claim, "[t]he burden is first on [Yazdian] to demonstrate a prima facie case of [national-origin] discrimination; it then shifts to the employer to offer a legitimate, nondiscriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext—i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem.Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### 1. Prima Facie Evidence of Discrimination

To make a prima facie case of national-origin discrimination, Yazdian must show "1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class." *Griffin*, 689 F.3d at 592 (internal quotation marks omitted). ConMed relies on a slightly different formulation of

---

[7]Yazdian uses the term "race discrimination," but we understand his claim to actually relate to his national origin, not his race.

the fourth factor: "that a similarly situated employee outside the protected class or classes was treated more favorably than [Yazdian]." Appellee Br. at 35 (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010)). ConMed uses this formulation to argue that Yazdian has not introduced evidence that there were "non-Iranian, non-Muslim Territory Manager[s] with a similar pattern of belligerent behavior" whom ConMed did not discipline or terminate. Appellee Br. at 37. But our cases establish that the plaintiff may establish a prima facie case under either theory. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1247 (6th Cir. 1995), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). ConMed's argument is therefore without merit.

The district court assumed without deciding that Yazdian had satisfied the burden of showing a prima facie case, but granted summary judgment in ConMed's favor on the basis that Yazdian could not show that the nondiscriminatory reason for the termination was pretext for national-origin discrimination. The record shows that Yazdian was qualified, discharged, and a member of a protected class. In addition, ConMed replaced Yazdian with Tyler Saneholtz, a non-Muslim, non-Iranian man. We therefore hold that Yazdian has met his initial burden of establishing a prima facie case of discrimination on the basis of national origin and religion.

## 2. Pretext

ConMed offers the same legitimate, nondiscriminatory reasons for Yazdian's termination that it offered in response to his retaliation claim: insubordination and bad behavior. The district court held that Yazdian had not produced evidence from which a reasonable jury could conclude that this reason was pretextual because the evidence of discrimination was "trivial." R. 57 at 16 (D. Ct. Op. & Order) (Page ID #2592). We agree.

Yazdian offers four reasons to believe ConMed terminated his employment because of his national origin and religion. First, he argues that the Honey Baked Ham Store gift certificate and accompanying email demonstrate that Sweatt treated Yazdian differently because of his religion. Sweatt bought the gift certificates for all territory managers, and therefore the record is clear that Sweatt actually treated Yazdian and his co-workers identically. We recognize that the gift may have been slightly insensitive, but Sweatt attempted to minimize the potential that the gift would cause offense by pointing out that Honey Baked Ham Stores sell non-pork products.

This incident is not enough for a reasonable jury to infer that ConMed terminated Yazdian because he is Muslim.

Second, Yazdian argues that Sweatt singled Yazdian out because of his Iranian heritage and religion when Sweatt gave Yazdian a National Geographic article about ancient Persia. Sweatt stated that he gave all his territory managers articles about topics they might find interesting and thought Yazdian would find the article interesting because he was proud of his Persian heritage. Yazdian has not offered any evidence to suggest that Sweatt's stated motivation for passing along the article was motivated by a negative animus against Iranians or Muslims, and so this evidence does not rebut ConMed's nondiscriminatory explanation for Yazdian's termination.

The final two incidents relate to how Sweatt treated Yazdian differently from non-Iranian, non-Muslim territory managers. Yazdian contends that Sweatt showed favoritism toward John Kruse and Pat O'Brien, white, non-Muslim men. Specifically, Yazdian points to the fact that Sweatt told Kruse that Kruse would not receive an award several days before delivering the same news to Yazdian. Yazdian also claims that evidence that Sweatt encouraged Pat O'Brien, but not Yazdian, to apply for a promotion is evidence of Sweatt's animus against Iranians and Muslims. But Yazdian has not cited any evidence to suggest that national origin or religion factored into Sweatt's decisionmaking in any way. Although different treatment may serve as the basis to make a prima facie case of discrimination, it cannot also be enough to satisfy the burden of demonstrating pretext.

Yazdian simply has not presented evidence from which a reasonable jury could find that ConMed's stated reason for terminating Yazdian was pretext for discrimination. Therefore, the district court did not err by granting summary judgment in ConMed's favor on the discrimination claim.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment and **REMAND** the case to the district court for further proceedings with respect to Yazdian's retaliation claim and **AFFIRM** the judgment with respect to the discrimination claim.