**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0647n.06

Case No. 16-5035

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 02, 2016
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ROBERT B. CADY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| REMINGTON ARMS COMPANY, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: DAUGHTREY, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. In 2013, Remington Arms Company fired its engineer Robert Cady. Cady sued, claiming wrongful discharge and failure to accommodate his back injury in violation of the Americans with Disabilities Act ("ADA"), and alleging that Remington failed to honor his severance agreement. Reasoning that Cady neither notified Remington that he was disabled nor sought an accommodation, the district court granted Remington's motion for summary judgment on the ADA claim. The court also granted summary judgment to Remington on Cady's contract claim, determining that Remington had cause to terminate Cady due to his refusal to perform assigned work. Cady appealed. Because a reasonable jury could find that Cady both notified Remington of his disability and requested an accommodation, we REVERSE.

I.

**A.     Cady's Back Problems Before Joining Remington**

In 2000, Cady hurt his back while bending over to tie his shoe.  Surgery relieved the pain until 2007, when his back pain flared again.  He underwent a second surgery in 2008, and for a brief period the doctor restricted him from lifting and bending.  Thereafter, Cady experienced little pain, and had no occasion to request work restrictions with his light-work job.

**B.     Cady's Employment Problems with Remington**

Cady began working as an engineer in Remington's Kentucky facility in 2012, where he was assigned to a team developing the R-51 handgun.  The position required Cady to attend meetings, deal with suppliers, solve production problems, and ensure that the designers and technical staff worked together.

From the outset, Cady clashed with team members. Cady described the environment as "hostile" and "unhealthy," and said that he had a "degrading relationship" with his boss.  Team members disliked working with Cady, too.   One engineer found Cady to be "needlessly confrontational" and testified that the "stress of dealing with Mr. Cady was one factor in [his] departure from the company."  Another colleague recalled that the "team was very alienated" and that "they were not getting along well."   Yet another co-worker described Cady as "Dr. Jekyll and Mr. Hyde," alternatively "argumentative and confrontational" or "unconcerned" with the work.  And although Cady's performance-review rated him as a valued team member, it also noted that he "struggled with identifying his role within the team" and that his "response during points of contention bordered on personal confrontation."

Remington reassigned Cady in April 2013 following a meeting regarding the handgun project's status.  During that meeting, Cady disagreed with his supervisor, Mike Keeney, about

whether to fully disclose that the R-51 prototype had failed during a test-shoot. Cady wanted to include the details of the failure in a presentation; Keeney instead "wanted to downplay" the failure because "[h]e was afraid that the program would get cancelled." In addition, toward the end of the meeting, Keeney congratulated another employee on the employee's appointment to a position that Cady wanted. The news angered Cady, and he threatened to resign. Remington's Vice President, Scott Franz, spoke with Cady after the meeting, told him to calm down, and convinced him not to quit. Shortly thereafter, Remington transferred Cady out of the work group.

## C.    Cady's Back Pain Returns

According to Cady, his back began "progressively getting worse" in May 2013, shortly after Remington reassigned him to the new work group. The following month he had an MRI and scheduled a meeting with his neurologist for Friday, July 12, to discuss the MRI results. The day before the neurologist appointment, Cady told Laura Norwood, Remington's HR manager, that he was going to the doctor due to back pain, and shared his MRI results with her. This was the first time that Cady told anyone at Remington about his back issues.

The MRI disclosed significant lower back problems, including spinal stenosis and nerve compression. Cady's doctor prescribed only pain medication because he was concerned that another intrusive surgery might exacerbate the pain. Cady told the doctor that his job was sedentary, and they agreed that he did not need any work restrictions.

## D.    The Events Leading to Termination

The Monday following his doctor's appointment, Cady traveled to the Remington facility in St. Cloud, Minnesota. Franz tasked Cady with increasing the facility's production capacity. Among other jobs, Franz wanted Cady to assemble Creform work stations—benches made out of

interlocking pipes and joints that can be customized to fit a particular manufacturing task. According to Cady, his job was to train others how to build the stations, not to construct them himself.

Cady arrived at the facility on the morning of Tuesday, July 16, 2013, and met with Todd Mittelstaedt, the plant manager. Mittelstaedt told him that the facility had recently lost eleven employees and was understaffed. Furthermore, Remington's chief operating officer had imposed a deadline to complete the Creform stations. Mittelstaedt therefore instructed Cady to spend the next few days building work benches. Cady responded that he did not have a problem constructing the stations, though he expected other employees to help. Mittelstaedt responded that the facility's production manager, Lee Vogel, would help Cady build the stations.

Vogel and Cady walked to a paved lot behind the facility, where the unassembled Creform components were stacked in the back of a semi-truck. Vogel climbed into the truck and pulled the parts to the mouth of the trailer bed, where Cady unloaded them. Shortly after starting the work, Cady told Vogel that his medication made him sensitive to sunlight. Vogel gave him sunscreen, and they moved to the shade.

As the morning progressed, Cady worried about aggravating his back injury. Vogel had stepped away from the project, leaving Cady to build the stations alone. According to Cady, climbing in and out of the truck to off-load the parts irritated his back. And to build the stations, he had to fasten and screw bolts, bend over, and saw pipe, which he thought might also strain his back. In addition, he fretted about standing for long periods on the pavement.

Shortly before lunch, Cady spoke with Greg Parker, one of his supervisors in Kentucky, "about the unsafe conditions" at the facility. Parker testified that Cady told him that "[h]e was concerned about his back, doing this up and down" and that "he didn't want to stand on concrete

for long periods of time because . . . he felt he was hurting his back." Cady also told Parker that "it was not conducive for him to be in the sun at that time because of his medication." And Cady recommended that they "hire a lower paid person to . . . help him do this work, that he was above this pay grade to be doing this work out in the sun." Parker instructed Cady to ask Vogel for better accommodations at the facility.

After speaking with Parker, Cady went to the conference room and worked on his computer. Vogel found Cady in the conference room. Cady expressed reservations about continuing to build the stations, and Vogel recommended they talk to Mittelstaedt. In Mittelstaedt's office, Cady told Mittelstaedt for the first time that he had concerns about his back. Cady also told Mittelstaedt that he could continue to work on the benches, but that he needed to "mix it up" and not work exclusively on the stations. According to Mittelstaedt and Vogel, Cady also complained that Remington had not hired someone else to build the stations, that his medication made him sensitive to sunlight, that he had been locked out of the building, and that there was too much forklift traffic behind the facility.

Mittelstaedt called Parker after the meeting. According to Parker, "Todd indicated that [Cady] had met with him and that [Cady] had explained that he had a back surgery and a concern of standing on concrete. . . . Todd indicated [] that he didn't need [Cady] there if [Cady] was going to not be able to perform the physical labor of building the Creform stations."

In the mid-afternoon, Parker called Cady and told him to return to his hotel. That evening Cady's supervisors and Norwood called Cady at his hotel, and told him to return to Kentucky the following day. When he arrived at work on Thursday morning, Remington fired him for "performance issues."

II.

The court "review[s] a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). "Summary judgment is appropriate where the movant demonstrates that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rocheleau v. Elder Living Constr., L.L.C.*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

III.

A.     Failure to Accommodate

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), which includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the accommodation would impose an undue hardship on the business, *id.* § 12112(b)(5)(A). To establish that Remington failed to accommodate his disability, Cady must show 1) that he is disabled, 2) that he is otherwise qualified for the position, 3) that Remington knew of his disability, 4) that he requested an accommodation, and 5) that Remington failed to provide the necessary accommodation. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998); *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997) (discussing analogous accommodation provision under the Rehabilitation Act). The employer may defend by showing that the proposed accommodation will impose an undue hardship on the business. *Kleiber*, 485 F.3d at 869; *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004).

Cady argues that Remington failed to accommodate his back injury during his trip to Minnesota. The district court found that Cady failed to produce evidence that Remington knew he was disabled or that he asked for an accommodation.

1.     *The Notice Requirement*

The ADA prohibits discrimination "on the basis of disability," 42 U.S.C. § 12112(a), which we have held requires that the employer knew or should have known that the employee was disabled. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999); *see also* 29 C.F.R. pt. 1630 app. § 1630.9. In the typical case, "[a]n employer has notice of the employee's disability when the employee tells the employer that he is disabled." *Hammon*, 165 F.3d at 450 (citing *Gantt*, 143 F.3d at 1046). Of course, the employee need not use the word "disabled," but the employer must know enough information about the employee's condition to conclude that he is disabled. *See Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007). Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737–38 (6th Cir. 2015).

Given the factual scenario Cady offers—which we must accept as true—a reasonable fact finder could determine that Cady notified Remington that he was disabled. First, Cady testified that the Thursday before flying to Minnesota, he told Norwood that he would be leaving work early to see a surgeon about his back pain. He also testified that he shared with her the results of his MRI, which disclosed "moderate to severe" spinal stenosis and nerve compression. Second, Cady's mid-morning call to Parker included two references to his back issues. Third, Cady told Mittelstaedt that he was concerned that building the stations would hurt his back, and

Mittelstaedt relayed Cady's concerns to Parker. Both Norwood and Parker were instrumental in recalling Cady to Kentucky and making the firing decision.

Taken together, a jury could find Cady's complaints about his back, coupled with Remington's knowledge of his surgeries, recent doctor's visit, and MRI results, sufficient to put Remington on notice that he was disabled.

Remington provides several arguments to the contrary. While a jury might find these persuasive, they do not entitle Remington to judgment as a matter of law. First, Remington contends that Cady expressed only a "concern" about his back to Parker and Mittelstaedt. If the sole evidence of notice was a vague assertion of concern, Remington's argument would have force. After all, many healthy people worry about their backs. But Cady also testified that he told Norwood about his back surgery, informed her that he was going to a surgeon to address the pain, and shared with her the MRI results. Second, Remington argues that "Cady embedded his complaint about his back within a series of other complaints and objections." Although a jury could find that Cady's litany of excuses obfuscated his complaint about his back, there is no rule that an employee's disability notification must stand alone. We therefore find that a jury could reasonably determine Cady provided Remington with notice that he was disabled.

### 2.       *Request for an Accommodation*

In addition to notifying the employer of a disability, an employee must inform the employer of limitations arising from the disability and request an accommodation. *Gantt*, 143 F.3d at 1046–47. An employee must affirmatively request an accommodation because many disabled people do not need an accommodation, and the employee is in the best position to know how the disability impacts their work. Furthermore, the ADA generally prohibits employers from inquiring about a disability's severity. *See* 42 U.S.C. § 12112(d). Thus, "[t]he employer is

not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt*, 143 F.3d at 1046–47. But once an employee notifies the employer of any limitations and requests an accommodation, the employer must discuss the limitations and potential accommodations with the employee. *See Kleiber*, 485 F.3d at 871; 29 C.F.R. § 1630.2(o)(3).

Here, a jury could find that Cady informed Remington that his back problems limited his ability to 1) climb into and out of the semi-truck, and 2) stand for long periods on pavement. Parker's deposition confirmed that Cady told him that "[h]e was concerned about his back, doing this up and down" and that "he didn't want to stand on concrete for long periods of time because . . . he felt he was hurting his back." Furthermore, Parker garnered information regarding Cady's limitations from Mittelstaedt's post-meeting call. Thus, Remington's decision-makers did not need to speculate about limitations arising from Cady's back problems: Cady told them himself. In addition, Cady told Mittelstaedt that he was willing to continue building the stations, but that he would need to "mix it up" and not work exclusively on the benches. In short, Cady identified specific ways that his back problems limited his ability to build Creform stations and asked to mix up his work tasks.

Remington argues that asking to "mix it up" is not a sufficiently specific request for an accommodation. But Cady's request was specific enough under the ADA to require Remington to inquire further about "the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)).

Accordingly, a reasonable jury could find that Cady adequately informed Remington of the limitations arising from his back problems and requested an accommodation.

## B.     Wrongful Discharge

In addition to the failure to accommodate claim, Cady argues that Remington fired him because his back problems prevented him from building the Creform stations. Cady relies on both direct and circumstantial evidence to establish his wrongful discharge claim.

### 1.     *Direct Evidence*

Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Cady points to evidence that he claims requires the conclusion that discrimination motivated the termination.

First, Cady argues that Mittelstaedt's comment that "he did not need a 'pencil pusher' who 'was going to not be able to perform the physical labor of building the Creform stations'" is direct evidence of discrimination. But Mittelstaedt was not involved in the decision to terminate Cady, and therefore his statement is not direct evidence of discrimination. Second, Cady points out that "there were no plans to terminate [him] *before* his trip to Minnesota, and that the events of the Minnesota trip directly led to [his] termination." The fact finder, however, still must infer that it was Cady's inability to construct the stations, and not his history of argumentativeness, that led to the firing. Accordingly, Cady has not provided direct evidence of discrimination.

### 2.     *Circumstantial Evidence*

To make a *prima facie* showing of wrongful discharge through circumstantial evidence, Cady must show that 1) he is disabled, 2) he is "otherwise qualified for the position," 3) he "suffered an adverse employment decision," 4) Remington "knew or had reason to know" of Cady's disability, and 5) the "position remained open while the employer sought other applicants

or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)). "[O]nce a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action[.]" *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). The plaintiff must then show that the defendant's explanation is pretextual. *Id.*

The district court dismissed Cady's wrongful discharge claim because it found Cady failed to notify Remington of his disability. We, however, decide here that a jury could find that Cady notified Remington that he was disabled. Remington does not otherwise argue on appeal that Cady failed to make out a *prima facie* case. The burden therefore shifts to Remington to put forth a legitimate reason for terminating Cady.

Remington argues that Cady's poor performance, including his aggressive attitude and lack of professionalism, is a legitimate non-discriminatory reason for termination. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007). Cady does not dispute that poor performance is a non-discriminatory justification, but argues instead that Remington's justification is pretextual. "[P]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 508 (6th Cir. 2014) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). A plaintiff establishes pretext by showing that the alleged non-discriminatory reason for the termination has no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to warrant termination. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

A fact finder could determine that Cady's performance issues didn't warrant firing. Indeed, this case is similar to *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 642 (6th Cir. 2015), where the plaintiff complained that his boss was creating a hostile work environment. Shortly after his complaints, the employer fired Yazdian, blaming his long history of negativity and unprofessional behavior. *Id.* at 644. We found that a jury could determine that the employer's explanation was pretextual, reasoning in part that though multiple supervisors "cautioned Yazdian about his communication style, they were not clear with Yazdian that these behavioral issues might lead to his termination." *Id.* at 653. His performance reviews were generally positive, with "good" or "very good" in all categories. *Id.* And although the performance review opined that "Yazdian's communications could be 'overly negative' when frustrated, [it] did not provide any suggestion that this was a major concern." *Id.*

Here, prior to Cady's trip to Minnesota, there is little evidence of Cady's unproductivity or poor work. Indeed, his performance evaluation rated him as either "valued" or "highly valued," depending on the topic. His supervisor evaluated him as "very well organized" and good at coming up with "very detailed plans." Franz pressed him not to resign following the April 2013 meeting. And it does not appear anyone at Remington counseled Cady about his work quality.

Moreover, the only contemporaneous documentation of Cady's personality problem was his performance review, which noted his "response during points of contention bordered on personal confrontation." No one at Remington otherwise counseled Cady on his workplace demeanor or interactions with other employees. And there is no evidence that he clashed with colleagues between the April meeting and his July trip to Minnesota.

Remington focuses on Cady's heated argument with his supervisor, Keeney, prior to the team's presentation about the handgun project's status. Remington claims Cady had a "meltdown" over the formatting of power-point slides. According to Cady, he disagreed with Keeney about whether to accurately report weapon failures. After Remington released the R-51, the handgun's failures were widely reported, leading Remington to recall the weapon. Thus, the parties disagree whether Remington reassigned Cady because he overreacted to the formatting of power-point slides, or because he expressed legitimate concerns about underreporting weapon failures.

Finally, Franz testified that Remington did not plan to fire Cady prior to his trip to Minnesota. Rather, the Creform-benches episode precipitated it. As Parker explained during his deposition, "[Cady] wasn't able to perform the work that we had asked him to do. . . . [I]f [he] wasn't going to be able to do this work, I didn't need him at that particular point [] on my team[.]" Remington contends that his refusal to build the stations demonstrated that he was a malingerer. Cady counters that Remington fired him because his back problems prevented him from building the stations. Because there are two reasonable interpretations of the evidence, one of which supports a finding of discrimination, summary judgment was not proper on this claim. *See Yazdian*, 793 F.3d at 653.

## C.      Severance Agreement

Cady also brings a claim for breach of a Severance Agreement. Given that issues regarding Cady's right to payment under that agreement turn on whether his discharge violated the ADA, we reverse the entry of summary judgment.

IV.

The judgment of the district court is VACATED and the case is REMANDED for proceedings consistent with this opinion.